FORET, Judge.
This is a suit for the rescission of a sale of an immovable. Plaintiffs-appellants, Eugenia Winters, Alvin Winters, Julian Winters, Alvina Winters Dupuis and Joseph Winters, instituted this action seeking rescission of a sale between their mother, Laura Sinegal, now deceased, and defendants-appellees, Alzina Winters Jean-Batiste and Allen Jean-Batiste, alleging that the sale was a pure simulation or, in the altnerative, a disguised donation, and should either be declared null or subject to collation. After trial on. the merits[1], the trial court ruled in favor of defendants and against plaintiffs.
Plaintiffs have appealed from that ruling, urging five specifications of error:
(1) The trial court erred in giving more credibility to testimony of defendants in view of many inconsistencies revealed in their testimony;
(2) The trial court erred in not declaring the sale a simulation;
(3) The trial court erred in giving more weight to the appraisal prepared by the Lafayette Building Association than that of plaintiffs' expert, and erred in failing to assign a specific dollar value per acre to the property at issue;
(4) In the alternative, the trial court erred in holding that the purported sale was not a disguised donation;
(5) In the alternative, the trial court erred in not ordering the defendants to collate where the price paid was less than the fair market value of the property-
FACTS
Laura Sinegal, decedent and mother of plaintiffs-appellants and defendant, Alzina Winters Jean-Batiste, sold approximately 25.96 acres of land on October 13, 1969, to defendants [2]. The sale was termed a cash sale with assumption and contained the following provisions as to the recited consideration:
“In addition to the consideration hereinafter mentioned, purchaser assumes, binds and obligates himself to pay that certain mortgage note dated November 18, 1964, executed by Laura Sinegal in favor of Lafayette Building Association, in the sum of $8,000.00, bearing 6V2 per annum interest and payable in monthly *110 installments of $70.00; said note is par-aphed ‘Ne Varietur’ for identification with an Act of Mortgage recorded in Book C-44 at page 77 under Act No. 466320 records of the Parish of Lafayette, Louisiana. The balance on said note as of the date of this assumption is in the sum of $6,156 23 [sic]
The said Laura Sinegal does hereby declare that she can no longer meet the monthly obligations to Lafayette Building Association as above set forth. Rather than face foreclosure on the aforesaid mortgage, Alzina Marie Winters, her daughter, and Allen Jean-Batiste, her son-in-law, agreed to assume the payment of said monthly obligations and enter into this sale with all its terms and conditions, they being the only ones willing to do so, which is an additional consideration for this sale.
As an additional consideration, purchasers herein, grant unto Laura Sinegal the right of use and habitation of the above described premises for the remainder of her natural life, free from the payment of any costs and charges therefor.
Parties hereto do hereby further declare that the $2,000.00 partial consideration hereinafter referred to constitutes money previously paid to the said Laura Sinegal, which money was applied towards payment of the aforesaid mortgage note.
[[Image here]]
This sale is made for and in consideration of the aforesaid assumption, o.v.c, and the sum of TWO THOUSAND AND NO/100.($2,000.00)__ Dollars, cash in hand paid, for which acquittance is herein granted.”
Laura Sinegal borrowed money from the Lafayette Building Association in order to finance the purchase of a house. That loan was secured by Laura Sinegal through a mortgage on the property at issue. Defendants assumed the mortgage balance of that loan. Apparently the loan proceeds were used for several other purposes, including farm tools and a water well for the property. The loan was to be repaid from proceeds of the loan received by Laura Sinegal and from wages earned while working as a farm laborer, farm leases on the property, oil and gas leases on the property, and the financial aid of defendant, Alzina Winters Jean-Batiste.
The record reflects that in 1969 Laura Sinegal experienced financial problems as a result of expired oil and gas leases. She was unable to meet the financial obligations of the mortgage in favor of the Lafayette Building Association. Laura Sinegal approached all of her children and requested that they help with the mortgage notes in order to keep the property at issue in the family. Plaintiffs were given an opportunity to participate in the sale at the time it was made; however, they declined to do so. They testified that they requested proof of threatened foreclosure by LBA and when such proof was not forthcoming, they refused to participate[3].
According to the terms of the cash sale, Laura Sinegal was allowed to occupy the property until her death, an event which occurred ten years later. On January 25, 1983, this action was instituted by plaintiffs.
ARE THE FINDINGS OF THE TRIAL COURT MANIFESTLY ERRONEOUS?
In brief, plaintiffs contend that the court’s conclusions of fact are erroneous in the following areas:
(1) Conflicting testimony between Dallas Credeur of the Lafayette Building Association and defendant, Alzina Winters Jean-Batiste regarding whether or not Laura Sinegal was in arrearages on the payments of the promissory note which was secured by a mortgage bearing against the subject property; and
*111 (2) Alzina’s testimony was in error with regard to the $2,000 cash consideration recited in the sale.
Alzina Winters Jean-Batiste testified that the sale of the property took place, in part, because of a threatened foreclosure by LBA. Dallas Credeur, loan officer for LBA, testified that foreclosure was not imminent. The conflict in the testimony of these two witnesses is not relevant to the issue at hand.
Plaintiffs apparently seek to attack the reasons or the motive for the execution of the sale. However, the reasons or the motive for the execution of the sale are not relevant once the reality of the sale has been established. Adams v. Trichel, 304 So.2d 740 (La.App. 2 Cir.1974). Additionally, at no time during the proceedings did the plaintiffs allege any fraud or overreaching, which would justify an action of nullity.
Plaintiffs contend that the trial court’s reliance on the testimony of defendant, Al-zina, to the effect that plaintiffs were afforded an opportunity to participate in the sale of October 13, 1969 was erroneous. However, the record reflects that plaintiffs readily admitted that before the execution of this sale, they were consulted regarding the financial problems of their mother.
After reviewing the record, we believe that the trial court’s findings of fact are not clearly wrong and should not be disturbed. Additionally, the conflicting testimony which plaintiffs relied on in requesting that the factual findings of the trial court be disturbed have no relevance with regard to the issues and facts before this Court. Consequently, this specification is without merit.
-SHOULD THE ACT OF SALE BE DECLARED A SIMULATION?
The Louisiana Supreme Court stated, in Owen v. Owen, 336 So.2d 782 (La.1976), that:
“In our law, a simulation is a transfer of property which is not what it seems. Simulations are of two types:. pure simulations, and disguised transfers.5 In a pure simulation, sometimes called a non-transfer, the parties only pretend to transfer the property from one to the other, but in fact both transferor and transferee intend that the transferor retain ownership of the property. When this type of simulation is successfully attacked, the true intent of the parties is revealed, which was that no transfer had in fact taken place. In a contest between a vendor and vendee in this situation the true intent of the parties is effectuated and the courts hold that no transfer took place because the simulated sale is an absolute nullity. Successions of Webre, 247 La. 461, 172 So.2d 285 (1965); Schalaida v. Gonzales, 174 La. 907, 142 So. 123 (1932); Milano v. Milano, 243 So.2d 876 (La.App. 1st Cir.1971). The other type of simulation is a disguised transfer which seems on its face to be a valid sale, but which is intended by the parties to be a gift rather than a sale. When this sort of simulation is attacked successfully, as it has been here under Article 2444, the true intent of the parties is likewise effectuated by the law. A valid transfer has taken place, but its form is a donation rather than a sale and the Code articles on donations apply to the transfer. Stevens v. Stevens, 227 La. 761, 80 So.2d 399 (1955); Carter v. Bolden, 13 La.App. 48, 127 So. 111 (La.App. 2nd Cir.1930); 35 La.L.Rev. 192 (1974); 25 La.L.Rev. 313 (1965).”
The term “simulation” refers to both a situation where there is no intent by the parties to transfer the property and the situation where there is an intent to transfer but not as a sale, rather as a gratuitous donation. In this specification of error, we will refer to the former situation, where there is no intent to transfer.
LSA-C.C. art. 2480 provides:
“In all cases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated, and with respect to third persons, the parties must *112 produce proof that they are acting in good faith, and establish the reality of the sale.”
We must examine the factual background of the case at bar to determine if the sale was in fact a simulation. To do so, we use the following analysis: did the parties act in good faith; was there an intent to transfer title (ownership); and was actual consideration exchanged for the transfer?
The parties to the sale unquestionably acted in good faith. No allegations have been advanced by plaintiffs to the contrary, nor does the record reflect any facts to prove otherwise.
The record reflects that decedent and defendants intended a transfer of ownership of the property when the act of sale was confected. Defendants assumed and made all payments on the mortgage balance, defendants assumed dominion over the property with regard to negotiation of various farm and mineral leases, as well as the receipt of all proceeds therefrom.
Plaintiffs concede that defendants intended a transfer of ownership, but continue to argue that their mother had no such intention. Plaintiffs contend that their mother was granted the use and habitation of the property even though not the usu-fruct at the time of the sale and that their mother expressed a desire to have the property transferred into her name so she could divide it among her children.
The reservation of the use and habitation, as opposed to the usufruct, denied Laura Sinegal her right to the incoming proceeds which could be realized from the property. Obviously, the ownership of the property was vested in defendants after the sale of October 13, 1969. The following line of testimony reveals an acknowledgment by Laura Sinegal and plaintiff that the property had been transferred to defendants in full ownership.
“Q During the time 1969 till when your mama passed, did you and she ever have a conversation about the land having been put into Allen and Alzina’s name?
A Yes, we did.
Q What was the nature of the conversation?
A She said, ‘ ’genia, I would like to put the property back into my name so I can go ahead and divide it between each one of you.’ And give the house to my oldest brother.
Q Okay. After that time, did you personally — Scratch that. Before your mom passed away, did you personally have an opportunity to talk to Alzina or Allen about what you and your mama had spoken about?
A Yes, I spoke to Alzina about it.
Q What type of response or answer did she give you?
A When I said I could borrow the money through my credit union and pay her back — because she did tell me at one time that if somebody would have the money to pay her back, she would take that without any interest.
Q Did she say how much she was asking?
A She told me $6,000 she would do it. But Allen didn’t agree to do it.
Q Okay. So after your mama died, did Allen or Alzina approach you about the property? Or about you acquiring an interest in the property?
A I beg your pardon?
Q After your mama passed away, did Allen or Alzina approach you about you acquiring an interest in the property?
A Alzina.
Q What did she tell you?
A She said, "genia, I’d like to give everybody their share, but it’s not just me in there, Allen is in there.’ Okay?
Q Eugenia, before Allen and Alzina purchased the property, did they have a joint meeting with all of the brothers and sisters informing them about the problem of paying the note on the land?
A I know it was her and my mother and my sister was together and talked about it. My oldest sister said—
*113 MR. CEDARS: Objection, that would be hearsay.
THE COURT: Sustained.
THE WITNESS:
Well, I say bring us the proof and then see what it’s for, then we can take over from there.”
Before her death, ten years after the act of sale, Laura Sinegal never took legal action to rescind the sale on the basis of lesion, overreaching, or fraud. We believe this to be the strongest evidence of the fact that Laura Sinegal intended and believed that the ownership of the property had transferred from her to defendants. Defendants testified that all parties to the sale understood that Laura Sinegal would have no right to use and enjoy the fruits from the property; she would simply have the right to live on the property.
The record reflects that an exchange of consideration did accompany the act of sale. A $2,000 cash consideration was a sum determined by Laura Sinegal herself, and the mortgage balance of $6,136.23 was assumed and timely paid by defendants. The right of use and habitation of the property was also an act of consideration.
Louisiana law recognizes that the assumption of a mortgage balance is sufficient consideration to defend an attack of a sale on the basis of concepts of simulation. Russell v. Culpepper, 344 So.2d 1372 (La.1977); Adams v. Trichel, supra; Morgan v. Gates, 396 So.2d 1386 (La.App. 2 Cir.1981). Additionally, in Hysmith v. Coleson, 421 So.2d 402 (La.App. 1 Cir.1982), the court stated that a transaction would not be set aside as a simulation if any consideration, no matter how small, supported the transaction, because in that way the reality of the transfer is established. The record reflects that the mortgage balance was assumed, a cash consideration was paid, and the right of use and habitation was granted. Consequently, we do not believe that there was a simulation and find that the reality of the transfer has been established by the defendants.
When the reality of the transfer has been established, any motive for the sale necessarily becomes irrelevant. Therefore, plaintiffs’ position regarding the conflicting testimony as to the reasons for the sale, the circumstances under which it was confected, and the fact that Laura Sinegal continued to occupy the premises is of no moment. Adams v. Trichel, supra, at 742-743.
DID THE TRIAL COURT ABUSE ITS DISCRETION IN REJECTING THE VALUATIONS ASSIGNED TO THE PROPERTY BY PLAINTIFFS’ EXPERT APPRAISER?
Expert opinion as to property value is not binding on the trier of fact because it is not conclusive — it is generally regarded as advisory in nature. Consequently, the trial judge is not required to accept or reject expert opinion in toto. The trial judge has the authority to evaluate, on his own, as a fact finder, although he may not completely disregard the testimony of the experts. Where the testimony of expert witnesses is contradictory, the findings of the trial court should not be overruled in the absence of manifest error appearing in the record.
Plaintiffs’ appraiser, Kenneth J. Mouton, is the president and broker of Belle Terre Properties, Inc. He stated for the record that appraisers in Louisiana need not be licensed. He also testified that he had only worked as a part-time appraiser since 1978.
He used the market data and income approaches to valuation of the property but rejected the income approach as being unreliable. Using the market data approach, he reviewed thirty-one sales from October, 1968 to October, 1969, and picked four which were comparable in size, location, and date of sale. He valued the property in question at $1,290 per acre or a total of $33,500.
However, Mouton admitted he had never personally inspected the property, nor the property which was the subject of any com-parables relied upon. Additionally, he simply relied upon four comparables out of a possible thirty-one. Comparable #3 was *114 the most accurate reflection of the value of the property at issue, as of October 18, 1969. The other comparables contained, at most, 11.4 acres.
Mr. Mouton stated that the terms of a sale are an important factor to consider in appraising property. He was totally unaware of the fact that the sale from Laura Sinegal contained a reservation of use and habitation. He readily admitted he did not review the terms of that sale except for purposes of ascertaining the property description and the number of acres involved. Other comparables relied upon by Mouton did not provide for reservation of use and habitation.
The value of property must be reduced according to whether the property is burdened with usufruct. Russell v. Culpepper, supra. We believe that it follows that property burdened with the use and habitation should also be subject to a reduction in its appraised value. Mouton, himself, testified that the fact that the property was burdened with the right of use and habitation was an important factor and would serve as the basis of a reduction in its appraised value. However, Mouton never adopted any efforts to adjust his appraisal accordingly.
Although defendants failed to introduce any evidence to rebut plaintiffs’ evidence via Mouton, they are not the ones who had to meet their burden of proof. Mouton’s ultimate valuation of the property is highly suspect in view of the foregoing discussion. Consequently, the trial court was not clearly wrong in its assessment of the testimony regarding values which should be assigned to the property. For the foregoing reasons, this specification is without merit.
WAS THE ACT OF SALE A DISGUISED DONATION?
In the alternative, plaintiffs urge that the act of sale was a disguised donation. They contend that the sale should be rescinded as an absolute nullity and, in the alternative, recognized as a donation and subject to collation. Defendants argue that if the sale was found to be a disguised donation, rescission is improper. Should the sale be found to be a disguised donation, the transaction is governed by the codal provisions on donations. Blossman v. Olsen, 365 So.2d 545 (La.App. 1 Cir.1978); Owen v. Owen, supra.
Plaintiffs argue that the recited consideration in the act of sale is less than ¼ of the value of the property and that therefore the sale is a disguised donation under Article 2444 of the Louisiana Civil Code. La.C.C. Art. 2444 provides that:
“The sales of immovable property made by parents to their children, may be attacked by the forced heirs, as containing a donation in disguise, if the latter can prove that no price has been paid, or that the price was below one-fourth of the real value of the immovable sold, at the time of the sale.”
The recited consideration in the sale was $6,156.23, representing the assumption of the mortgage balance, plus $2,000 cash. The assumption of the mortgage balance is not disputed; however, plaintiffs question the reality of the $2,000 cash consideration.
For this sale to be successfully attacked under Art. 2444 of the Louisiana Civil Code, the value of the property as of October 13, 1969 would have to exceed $24,-624.92 or $948.57 per acre. If the consideration advanced by defendants is deducted, as being the true consideration of $8,156.23, a successful attack on the sale would entail a value of the property in excess of $32,624.92 or $1256.73 per acre.
Mr. Mouton, plaintiffs’ appraiser, valued the property as of 1969, at $1290 per acre or a total of $33,500. However, as previously discussed, Mouton’s testimony is inadequate. Furthermore, the record reflects that the property was appraised by the Lafayette Building Association four years earlier and after personal inspection of the property, valuing the property at $10,500 total, or $404.46 per acre. Consequently, it does not appear that the trial court was clearly wrong on this issue.
The inadequacy of plaintiffs’ presentation is stressed by the fact that the valúa- *115 tions relied upon by their expert do not contain any adjustments for the reservation of the right of use and habitation. We do not know that the valuations of the plaintiffs, without this adjustment, would fall short of the threshold amount necessary to satisfy the one-fourth valuation specified in Art. 2444 of the Louisiana Civil Code. However, Mouton set the value of the property at $1,290 per acre, just over the threshold amount of $1,256.73.
Additionally, defendant, Allen Jean-Batiste, filed an exception of no cause of action stating that an action under Art. 2444 of the Civil Code may be brought only if the sale of the property is to children. Allen Jean-Batiste was not a child of Laura Sinegal, he was her son-in-law. In Nelson v. Wiegand, 224 La. 731, 70 So.2d 665 (La.1953), the court held that a sale of property to a son-in-law is not subject to attack on the basis of Art. 2444, by the children (forced heirs) of the vendor.
SHOULD COLLATION HAVE BEEN ORDERED BECAUSE THE SALE PRICE OF THE PROPERTY WAS LESS THAN THE FAIR MARKET VALUE?
Plaintiffs cite the case of Succession of Hoffpauir, 446 So.2d 931 (La.App. 3 Cir.1984), for the proposition that a transfer of immovable property may be subject to collation even though the price paid was greater than one-fourth the value, but less than 'the fair market value.
Defendants contend that although the principle of law cited by plaintiffs is accurate, the posture of these proceedings does not mandate collation. Defendants argue that it is well recognized that collation must be introduced incident to a succession proceeding and not in litigation seeking to nullify a sale. Owen v. Owen, supra; Blossman v. Olsen. The Court in Owen v. Owen, supra, at 789, accurately summarizes this legal precept:
“Plaintiffs’ final alternative argument is that the advantage bestowed upon W.H. Owen by his father when W.H. was donated the property in dispute is subject to collation. C.C. art. 1248. Collation, however, is not properly demandable in this suit which is primarily an action to set aside a sale by a parent to one of his children on the ground that it is a donation in disguise and a donation omnium bonorum. Collation is made only to the succession of the donor, C.C. art. 1242, and it is clear that a demand for collation must be brought incident to a succession proceeding, and not made part of a suit to nullify a sale. Taylor v. Brown, 223 La. 641, 66 So.2d 578 (1953); LaMotte v. Martin, 52 La.Ann. 864, 27 So. 291 (1899); Jackson v. Jackson, 175 So.2d 360 (La.App. 2nd Cir.1965) and cases cited therein. If the succession proceedings have been opened for I.M. Owen’s estate, it is in those proceedings which this claim must be brought. If the succession has not been opened, then the claim for collation is premature. Jackson v. Jackson, supra.”
The record indicates that the recited consideration in the act of sale of October 13, 1969, was not substantially less than the fair market value. We have already reviewed the analysis and valuation advanced by Mr. Mouton and the valuation advanced by Lafayette Building Association. Furthermore, defendant, Allen Jean-Batiste is not a proper party to be subjected to collation, and a succession proceeding has not been instituted.
Accordingly, this specification is without merit.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed, and all costs of this appeal are taxed against plaintiffs-appellants.
AFFIRMED.

. Defendant, Allen Jean-Batiste, filed peremptory exceptions of no cause of action and prescription. These two exceptions were referred to the merits. The trial court ruled that these two exceptions be dismissed as moot in view of the court’s ruling on the merits.

. Alzina was the second oldest child of Laura Sinegal and, at the time of the sale, was married to Allen Jean-Batiste. At the time of the trial, Alzina was already divorced from Allen Jean-Batiste.

. The record reflects that Laura Sinegal was not in arrears on the mortgage note. However, Alzina Winters Jean-Batiste was under the impression that foreclosure was imminent and believed that they were two months in arrears on payments.